IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JASON B.,

                    Plaintiff,                                    4:20-CV-3050

vs.

                                                         MEMORANDUM & ORDER
ANDREW SAUL, Commissioner of
Social Security,

                    Defendant.


The plaintiff, Jason B., appeals from the denial, initially and upon reconsideration, of his application for supplemental security income under Title II, 42 U.S.C. §§ 401 *et seq.*, and disability insurance benefits under Title XVI, 42 U.S.C. § 1381 *et seq.* of the Social Security Act. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Court finds that the Commissioner's decision was supported by substantial evidence, so the plaintiff's motion for reversal (filing 16) will be denied, and the Commissioner's motion for an order affirming his decision (filing 18) will be granted.


I. PROCEDURAL HISTORY

On September 29, 2017, the plaintiff protectively filed for supplemental security income and disability insurance benefits alleging disability beginning September 2, 2016. T17. His claim was denied initially and on reconsideration. T17. At a hearing before the administrative law judge (ALJ), the plaintiff amended his alleged onset date to September 29, 2016. T40. Following that hearing, the ALJ found the plaintiff was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), & 1382c(a)(3)(A) and therefore not entitled to benefits

under the Social Security Act. T30. The Appeals Council of the Social Security Administration denied the plaintiff's request for review of the ALJ's decision. T1. Accordingly, the plaintiff's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff lives in Sidney, Nebraska, is married, and has four children. T210-12, 272. At the time of hearing, he lived with his wife and two children, ages 16 and 18. T57-58. He last worked for the United States Postal Service as a clerk in September 2016. T41, 238. Prior to that, the plaintiff did mostly manual labor and maintenance. T61, 238. The plaintiff filed for disability alleging problems with his shoulders, knee, and back, depression, benign hypermobility joint syndrome, and high blood pressure. T250.

In 2011, the plaintiff had surgery on both shoulders, followed by physical therapy. *See* T372-379. The surgeon released the plaintiff from care after 19 weeks documenting "[e]xcellent motion[,] [n]o instability, some soreness at time, but not unexpected." He also noted "within certain expectations, I think he is ready to proceed with some type of work." T374.

In January 2017, the plaintiff began treatment at the Franklin County Memorial Hospital Health Clinic. *See* T387. Initially, he went in complaining of chest pain and shortness of breath. T387. Then in February he came back after falling on his shoulder, hip and knee. T388. Kathy Murphy Buschkoetter, A.P.R.N. evaluated his complaints of loose and painful joints and difficulty with daily activities and sleeping. T388-89. Her objective exam revealed the plaintiff could not lift his arms above his head and had significant pain with movement, sitting or standing. T389. She noted "it is difficult for him to find a

comfortable position," and "he appears to be very discouraged." T389. Buschkoetter thought physical therapy and bracing might be helpful, but also wanted the plaintiff to see a specialist at the Arthritis Institute of Nebraska for additional evaluation. T389.

In February 2017, the plaintiff saw Rick Chatwell, M.D. at the Arthritis Institute for a rheumatology evaluation. *See* T297-302. The plaintiff complained of pain in his shoulders, back and right knee as well as numbness in his arms and hands. T297. He also reported trouble sleeping due to pain and headaches from Soma, the medication he used to sleep. T297. Chatwell documented pain in both of plaintiff's shoulders on examination as well as primary osteoarthritis in all of plaintiff's joints. T299. No tenderness was documented in plaintiff's spine and plaintiff was negative for radicular symptoms on both sides. T300. X-rays were also taken of the plaintiff's right shoulder and both hands. Minimal degenerative cortical changes at the rotator cuff insertion site on the humerus and degenerative changes along the inferior aspect of the glenoid were observed. Mild degenerative changes in plaintiff's right fifth finger DIP joint, left first CMC joint, and left distal radioulnar joint were also observed. T301.

Chatwell diagnosed the plaintiff with benign joint hypermobility syndrome, but noted that the primary problem was chronic musculoskeletal pain. He recommended the plaintiff follow-up with a primary care provider to manage pain without narcotics, and for "formal physical therapy" and a water exercise program. According to Chatwell, because the plaintiff wasn't working "he really has no reason not to pursue formal physical therapy followed by [a] self-directed daily home exercise program." And Chatwell noted that "complete pain relief is not a reasonable goal," but that the plaintiff "should work to

manage his symptoms so that he may pursue an occupation." Chatwell also recommended a formal psychology referral and therapy. T300.

On March 14, 2017 the plaintiff returned to see Buschkoetter and asked about physical therapy and losing some weight as recommended by Dr. Chatwell. T390. Buschkoetter's objective exam noted limited range of motion in the plaintiff's arms, but that he could lift his left arm about 45 degrees with some pain. T391. He was also scheduled for physical therapy. T391.

On March 20, 2017 the plaintiff saw Mary Lutkemeier for a physical therapy evaluation. T311-13. The plaintiff rated his pain at 5/10 and reported a history of falls and pain with any type of activity. Most recently he had tried some light yard work and was still experiencing pain a day or two later. Lutkemeier noted the plaintiff had a slow, cautious gait and decreased stance on his right leg due to knee pain, but could complete transfers independently. She further noted that laying down caused pain in the plaintiff's shoulders, but that propping up his arms with pillows seemed to reduce his discomfort. T311. When seated, the plaintiff showed "depressed" shoulders with pain on palpation. T311-12. He could lift his arms on both sides to 90 degrees of shoulder flexion and had full elbow and wrist range of motion. Passively, the plaintiff showed 110 degrees of shoulder flexion before experiencing partial dislocation. According to Lutkemeier, the plaintiff could partially dislocate his shoulders with movement. In regard to his legs, Lutkemeier noted the plaintiff had active range of motion in his right knee with 3+/5 muscle strength and left leg muscle strength of 4-/5. T312.

Lutkemeier concluded that the plaintiff had significant limitations in his active shoulder movement, weakness in his right leg, and pain, but that he also had "fair rehab potential." T312. The plaintiff and Lutkemeier set short and long term goals to improve strength in his shoulders and legs and stability in

his shoulders and scheduled plaintiff for physical therapy sessions 2-3 times per week for 6-8 weeks. T312. The notes from the plaintiff's physical therapy sessions are handwritten and somewhat difficult to decipher, but it does appear that he was increasing strength and reducing his pain, particularly with aquatic therapy. *See* T322-23.

On May 4, 2017 the plaintiff went to the Franklin Clinic and complained that he had fallen a couple of times and landed on his left shoulder. T309. He was experiencing "more severe" pain and had tried to mow the lawn that day, but just turning the steering wheel on the riding mower had increased his pain. Honey Kibbee, N.P.C. examined plaintiff and noted good strength in his arms and good grip strength with limited range of motion—about 75 degrees from the side and he could not get his arm behind his back. Linda Mazour, M.D. injected the plaintiff's left shoulder with Lidocaine and Depo-Medrol and told him to report whether it made a difference. T309.

On May 16, 2017 the plaintiff was discharged from physical therapy. T307. He hadn't been to physical therapy since April 10, and hadn't called to schedule any sessions. The plaintiff reported that his "extremely busy" schedule coupled with increased activity had resulted in soreness and fatigue. And he also said the land-based activity increased his discomfort and pain while the aquatic therapy was more beneficial. A practitioner noted that the plaintiff "did not appear to be progressing with diminished discomfort and pain or able to increase his activity level without increasing his pain level." T307.

In August and September 2017 the plaintiff saw a chiropractor, Derrick Rocker, at the Franklin Clinic. *See* T336-41. In August, the plaintiff had been lifting/moving things around in his garage which caused low back and left leg pain. He also complained of neck pain. T336. Rocker noted muscle tightness in the plaintiff's neck, pelvis and lumbar spine with tenderness upon palpation.

T337. In September, the plaintiff thought he had picked up something heavy and complained of neck pain, right leg pain radiating into his foot, and mid-back pain. T339. Rocker again noted muscle tightness in the plaintiff's neck, pelvis and thoracic and lumbar spine with tenderness on palpation. Rocker also performed a straight leg raise test that was negative for increased leg pain. T340.

 The plaintiff filled out an activities of daily living supplemental report in October of 2017. T260-63. At that time, he reported going to church for one hour weekly and visiting family for a few hours on holidays. At church, he had to mostly stay seated, and after church he "spent the day in [his] recliner with [his] leg up. Otherwise, he stayed home because he was "constantly in pain." T260.

The plaintiff also reported cooking daily, and doing dishes and laundry every couple of days. But he said the dishes could take hours to finish because he needed breaks. T260. Similarly, he could use the riding lawn mower once a week, but it would take 2 days to recover from the pain. The plaintiff said he drove seven miles to town a couple of days a week. And he reported that his errands were limited to using a motorized cart at larger stores, but if the store was small he would have his wife or daughter go instead. T261. He said he'd restricted or stopped most activities because of his pain. T263.

According to the plaintiff, most of his time was spent in his recliner or in bed watching TV or reading. T261. And his sleep had been disrupted by pain, so he'd tried to sleep on the couch or in the recliner, but only medication had helped. T262. Due to his condition, the plaintiff felt restless most of the time and when stressors hit, he would feel anxiety and helplessness. Once the anxiety subsided, he would feel depressed. To deal with these difficult feelings,

he would zone out to the TV, read his Bible, or seek counseling from his pastor when possible. T263.

On January 2, 2018 the plaintiff saw Nolan May, M.D. at New West Sports Medicine & Orthopedic Surgery in Kearney, Nebraska. T402-06. The plaintiff complained of right knee pain because of a possible dislocation when turning around while walking. The plaintiff also said when he bent his knee he would experience numbness and tingling from his knee down. T402. May's objective exam revealed 5/5 muscle strength and tone throughout both legs. *See* T405. May also observed tenderness over the plaintiff's right knee medial and lateral joint lines, and trace effusion. And May performed some functional testing that showed positive medial meniscal rotation, and a positive straight leg raise. Notably, there was no tenderness present in the plaintiff's back. T405.

Dr. May ordered an x-ray of the plaintiff's right knee, which showed the patella at an appropriate height and well centered. And the x-ray found no bone-on-bone arthritis or fractures. T405. May then referred the plaintiff for a nerve conduction study to evaluate sciatica versus radicular symptoms. May concluded that the plaintiff's perceived instability was "kind of a pseudo instability as he has quad inhibition." T406. He also determined the plaintiff's knee was stable, and opined the numbness and tingling was "more back oriented." T406.

A few weeks later, the plaintiff saw David Schanbacher, M.D. for nerve testing. *See* T407-09. Most of the testing came back normal, but Schanbacher found evidence of chronic right peroneal neuropathy affecting the deep and superficial peroneal nerves and sparing the short head of the biceps femoris. T408. Schanbacher noted no active denervation in the muscles supplied by the

peroneal nerve and no evidence of sciatic neuropathy, plexopathy or radiculopathy in the right leg. T408.

At the end of January 2018, the plaintiff saw Elizabeth Morell, Ph.D. for a state agency psychological examination. *See* T417-21. He told Morell that he had been struggling with depression and anxiety for a couple of years beginning with his knee injury. And he reported getting easily agitated due to pain. T418. The plaintiff said he felt worthless and hopeless because of financial struggles related to his inability to work and support his family. *See* T419. At the time of the assessment, the plaintiff was taking Cymbalta and scheduled to meet with a mental health provider, but had not received regular mental health therapy. T419.

Morell noted that the plaintiff was oriented, had adequate abstract reasoning, judgment, and insight, and had a normal mood and affect. T419-20. But she also noted that the plaintiff reported impaired short-term memory, poor energy levels, and some suicidal ideation. T419-20. Morell concluded that the plaintiff could maintain social functioning, sustain concentration and attention, understand and remember short and simple instructions, relate appropriately to coworkers and supervisors, adapt to changes in his environment, and manage his own finances. T420, 422. She diagnosed him with "major depressive disorder—recurrent, moderate" and "unspecified anxiety disorder." T420. Morell indicated a guarded to poor prognosis "even if he engages in therapy and continues medication . . . unless there is a major change [in] his physical, financial and [quality of life]." T420.

That same day, Meryl Severson, M.D. completed a state agency physical examination of the plaintiff. *See* T423-29. The plaintiff complained of shoulder pain, hand numbness, and reduced range of motion and strength in both arms consistent with his prior medical visits. *See* T425. He also complained of both

right and left knee pain, because he had injured his left knee just before Christmas 2017. The plaintiff reported that with his cane he could walk 50 feet, climb one flight of stairs, and stand about five minutes. And he reported he could sit for at least 20 minutes at a time, but that he could not drive for more than an hour, and when he did drive he couldn't do anything for the rest of the day. T425. The plaintiff also complained of back pain, which he treated with chiropractic care. According to the plaintiff, without chiropractic manipulation, he had sciatic pain and right leg numbness. Finally, he said that his high blood pressure exacerbated his pain. T426.

Severson performed a comprehensive physical examination and found the following limitations: limited range of motion in both shoulders, including only 80/180 degrees in any direction; limited flexion in the lumbar spine of only 70/90 degrees; and sensory loss in both legs. T423-24. But he also documented full range of motion in the elbows, wrists, knees, hips, cervical spine, and ankles; as well as good grip strength in both hands, good upper extremity strength on both sides, and good lower extremity strength on both sides. T423-24. Severson noted that the plaintiff required a cane to ambulate, and went at a slow pace, keeping his weight to his left side. T424, 427. He also noted the plaintiff had numbness in several fingers, but retained good fine motor coordination of his hands. T428.

Severson's impression was that the plaintiff could not lift and carry, push, pull, or reach above the shoulder level. But he opined that the plaintiff could perform tasks at chest level or waist level that do not require holding objects more than 5 pounds, so long as he could ambulate with his cane. T428. Severson did not believe that plaintiff's high blood pressure would interfere with his employment. T429.

On January 30, 2018, the plaintiff returned to Dr. Nolan for follow-up after his nerve testing with Dr. Schanbacher. *See* T432-34. Nolan performed a physical exam that was largely consistent with Dr. Severson's exam several day's prior and primarily focused on the plaintiff's right knee. *See* T433. Nolan also discussed the benefits and risks of performing surgery on his knee and the likelihood of the plaintiff's peroneal neuropathy being resolved. Nolan opined that because of his history of "back issues" and "shoulder and upper extremity numbness and tingling" the surgery was unlikely to resolve the plaintiff's "nerve issues." T434.

On March 8, 2018, the plaintiff visited the Sidney Regional Medical Center Clinic to establish care with Rebecca Allard, M.D. T442. The plaintiff discussed his shoulder, back and knee pain, but seemed focused on his poor sleep as the medication he had been taking was no longer covered by insurance. He also expressed an interest in weight loss surgery. T442. Allard recommended physical therapy, prescribed a new sleep medication and anti-depressant, and referred the plaintiff to another doctor to discuss weight loss surgery. T444. At the end of March, the plaintiff saw Matthew Jansen, M.D. for an initial evaluation for bariatric surgery. T446.

On March 23, 2018 the plaintiff met with Brad Kennedy, P.T. to begin physical therapy. *See* T466-70. He complained of shoulder, knee and back damage and resulting pain as well as depression. *See* T466-67. The plaintiff also said that since moving to Sidney, he hadn't received chiropractic services, which had been helping with back pain. T466. He described his daily activities as about 10 minutes of washing dishes and any cooking and cleaning, which were more uncomfortable and difficult to accomplish than they used to be. T467. And he complained that walking short distances left him out of breath. T467. The plaintiff also described having to hold a baby as part of his wife's at-

home daycare facility and the infant feeling "very heavy." T467. He wanted to improve his strength and endurance, explore shoulder braces to improve his sleep, and improve back strength so that getting up and down was not as painful. T467-68.

Kennedy's objective assessment was that the plaintiff had some self-limiting beliefs that could make physical therapy and rehab difficult. *See* T468-69. He observed the plaintiff did have physical limitations, including limited range of motion in his back in all directions, tenderness in most places (but specifically the low back), discomfort with straight leg raise on both sides, poor lower abdominal strength, and weakness in his legs (particularly his right leg). Kennedy also observed good hamstring flexibility, no significant sciatic nerve issues, and no significant discomfort with back rotation or in the plaintiff's abdominals. Kennedy performed a six-minute walk test and plaintiff moved 444 feet with his cane without changes in his gait or rest. T468.

Kennedy remained hopeful that the plaintiff could gain back some of his function after "being very sedentary," despite the plaintiff's limiting beliefs. T468. The plaintiff and Kennedy set short- and long-term goals to improve strength and endurance as well as the plaintiff's self-perception, and the plaintiff was scheduled for therapy 2-3 times per week for 30 days. T469.

On March 26, 2018 the plaintiff started physical therapy. That day he reported a long day "handling and holding some children" which left him feeling a little worse for wear. After some gentle strengthening and stabilization exercises, the plaintiff reported increased shoulder and back discomfort. But Kennedy encouraged him to be patient, as the more they worked together the more the plaintiff's activity tolerance would improve. T471.

On April 10, 2018 the plaintiff followed-up with Dr. Allard complaining that the sleep medication and antidepressant were not working and asking about nerve conduction studies for his arms. T448. He also said daycare and physical therapy were wearing him out. T448. Allard provided a referral for nerve testing, and also recommended a dietician visit, sleep study, psych evaluation and testing for Hashimoto's.[1] T450. And on April 11, 2018 the plaintiff had an upper endoscopy and biopsy to further assess the option of bariatric surgery. *See* T451-55.

The plaintiff attended physical therapy throughout April 2018. *See* T473-92. During that time, the plaintiff reported pain in his joints, but was seeing slow but steady improvements in strength, flexibility, stabilization, and endurance. *See* T473-92. Kennedy was hopeful that the plaintiff could continue to improve with additional therapy. T475, 477. On April 9, 2018 Kennedy noted that the plaintiff had "definitely gotten better activity tolerance [with] more aggressive exercises without any long-term increases in complaints." T479.

Kennedy completed a 30-day re-evaluation on April 27, 2018. T485-87. The plaintiff felt that "maybe" he had better endurance, activity tolerance and stamina. But his self-disability rating was actually higher than on initial evaluation. He was also fitted with shoulder braces to help support his joints while sleeping. T485. Kennedy performed some testing and found the plaintiff still struggled with sit-to-stand, but did have a 4-second improvement, and his 6-minute walk distance had improved by 100 feet. The plaintiff's gait had not improved significantly, but he had potentially gained some lower abdominal strength. T485. Kennedy concluded that there had been objective gains in the plaintiff's activity levels, but that his self-rating had gotten worse, so he would

---

[1] Hashimoto's thyroiditis is an autoimmune illness involving inflammation of the thyroid gland. *Taber's Cyclopedic Med. Dictionary* 886 (19th ed. 2001).

"have to rely on objective measures and changes for any real show of improvement." T486. Nevertheless, Kennedy felt that the plaintiff still showed capacity for progress and scheduled him for therapy 2-3 times per week for another 30 days. T486.

On his next visit the plaintiff reported a "bad strain" in his right knee and Kennedy noted his gait was "significantly antalgic."[2] T488. The plaintiff also complained of some digging-in with his shoulder braces, and planned to bring the braces in for adjustment. Kennedy encouraged him that increased strength would also improve his quality of life regarding pain with activity. *See* T488. Kennedy noted that the plaintiff has tolerated the increase in activity and continued to show progress despite his self-limiting beliefs. T488.

The plaintiff returned on May 7, 2018 for his last documented physical therapy visit and complained of left shoulder problems after some exercises he had completed the previous week. He was apprehensive about doing additional arm and shoulder exercises as he experienced debilitating pain after doing similar exercises before in physical therapy. He also forgot to bring his shoulder braces for adjustment and reported minimal use of them. T490. After trying some modified exercises based on the plaintiff's complaints, Kennedy noted "some limitation in the ability to progress," and hoped it "would not be the continued norm" or he might have to discharge the plaintiff from therapy. Nonetheless, Kennedy was hopeful that the plaintiff could continue with progress if he could overcome "obvious self-limitation." T490. Unfortunately, the plaintiff stopped showing up for his scheduled appointments and on May 23 Kennedy discharged him from care for lack of follow-up. T546-48.

---

[2] Antalgic gait occurs when the patient experiences pain during the stance phase and so remains on the painful leg for as short a time as possible. *Taber's Cyclopedic Med. Dictionary* 806 (19th ed. 2001).

For the remainder of 2018 the plaintiff was seen primarily for appointments related to weight loss surgery . *See* T497-517, 550-82. In August, he saw Dr. Allard and had lost 40 pounds by changing his diet, and was encouraged to continue to move to maintain muscle mass. T576-78. In September, he went to the clinic on two occasions requesting joint injections— first in his left shoulder, which was approved, and second in his right shoulder and right knee, which were refused. *See* T589-92, 603-05. Allard also adjusted his sleep medication in September due to complaints of memory loss. *See* T603-05. By December the plaintiff had lost about 80 pounds and Dr. Jansen wanted to defer surgery to see if the plaintiff could lose additional weight on his own. T498-99.

The plaintiff did undergo a sleep study at the end of May 2018, and was diagnosed with mild obstructive sleep apnea and given a CPAP machine. T552-53. The study revealed "excellent sleep efficiency," as the plaintiff took only 2.9 minutes to go to sleep and stayed asleep for 370 minutes with REM sleep after 120 minutes. T552. In August 2018 the plaintiff saw Dr. Allard and reported he wasn't using the CPAP well. T576.

On December 3, 2018 the plaintiff went to the emergency room complaining of chest pain after walking down the stairs at home. *See* T677. The clinicians in the ER ran several tests, provided pain medication, and observed the plaintiff for about 8 hours, but ultimately discharged him with instructions to see Dr. Allard for follow up. *See* T677-84.

On February 12, 2019 the plaintiff saw Andrew Stieb, P.A. complaining of shoulder pain on both sides and requesting injections. *See* T695. Stieb noticed "obvious laxity" in the plaintiff's shoulders and limited strength and movement. Stieb also took x-rays which showed arthritis of the glenohumeral joint on both sides. The plaintiff received injections in both shoulders. T697.

## 2. Opinions

Several opinions appear in the record from treating physicians and state consultants in addition to those from Morell and Severson outlined above.

Eddie Pierce, M.D. provided an opinion dated October 30, 2017 regarding the plaintiff's mental capacity. T356-58. According to Pierce, the plaintiff had major depressive disorder, but it had no impact on his ability to understand, remember or apply information; concentrate, persist, or maintain pace; adapt or manage himself; or interact with others. T356-58. But there are no treatment notes from Dr. Pierce included in the administrative record.

Dr. Mazour provided an opinion dated November 1, 2017. T360-61. Mazour diagnosed the plaintiff with osteoarthritis from multiple joint injuries, benign hypermobility of joints, chronic pain, depression, hypertension and obesity. According to Mazour, the symptoms from those impairments would constantly interfere with the plaintiff's attention and concentration required to perform simple work-related tasks. She also said dizziness and drowsiness from the plaintiff's medications would impact his capacity to work. And Mazour opined that the plaintiff could only be up 15-20 minutes of the day before needing to recline or lie down for a period of time, and that he may be able to repeat the 15-20 minutes of sitting or standing one more time before lying down for the remainder of the day. She also opined that the plaintiff could not lift and carry any amount of weight, could not lift overhead, and could not use his hands, fingers and arms to reach, grasp or manipulate objects for more than 5 percent of an 8-hour workday. T360. Finally, Mazour opined that the plaintiff would be absent from work more than four times per month. T361.

Nurse Practitioner Buschkoetter wrote a letter dated May 2, 2017 regarding the plaintiff's physical capacity. T368-69. Buschkoetter noted that when she examined the plaintiff, he had "significant difficulty moving his

upper extremities" and could not raise his arms more than "30-35 degrees." T368. Buschkoetter also referenced the imaging performed by Dr. Chatwell in support of Chatwell's diagnoses for hypermobility, musculoskeletal pain, low back pain, numbness and tingling in his hands, morbid obesity and hypertension. T369. And she said the plaintiff had tried physical therapy as recommended by Dr. Chatwell, but saw no improvement in the pain in his shoulders and arms. T368. Buschkoetter opined the plaintiff would not be able to complete the tasks required for any job that required any type of physical labor, and would "have a great deal of difficulty finding a job that can accommodate his limitations." T369.

Dr. Rocker wrote a letter dated May 3, 2017 regarding the plaintiff's physical capacity. T370. Rocker recounted several situations where the plaintiff presented for chiropractic care with back and neck pain and said that the plaintiff was "one of the most severely, debilitated [sic] cases" of pain he'd ever seen. Rocker opined the plaintiff "would have a very hard time performing any job for up to 8 hours daily without severe pain," including an office job "as staying in any position for an extended period of time causes significant pain." T370.

On March 6, 2018, state agency consultant Joanell Wheeler, M.D. reviewed the plaintiff's medical records through January 2018 and issued a report for the agency. *See* T67-106. Wheeler opined that the plaintiff was essentially capable of sedentary work consistent with the residual functional capacity (RFC) that the ALJ substantially adopted in his decision. *See* T100-103, T23. Wheeler reasoned that the evidence of record showed several physicians encouraging the plaintiff to engage in increased physical activity. *See* T102. Moreover, Wheeler pointed to the plaintiff's own reports to Lutkemeier that he was "extremely busy," which made attending physical

therapy difficult. T102. And Wheeler noted that the plaintiff had not recently sought treatment for back pain and was medically cleared to become a foster parent despite claims he could "do very little." T102-03. In the same report, Glenda Cottam, Ph.D., a psychological consultant, determined the plaintiff's mental health diagnoses resulted in, at most, only mild limitations. *See* T74-75, 78.

On May 15, 2018, state agency consultant Jerry Reed, M.D. affirmed Wheeler's RFC determination at the reconsideration stage. T124, 144. After reviewing additional records from Dr. May, Dr. Schanbacher, and the providers at the Sidney Clinic, the disability examiner determined that the medical evidence of record still supported a RFC of sedentary work. T138. In particular, the examiner pointed to the plaintiff's routine physical therapy which showed promise for continued benefit and the biggest obstacle being the plaintiff's self-limitation. T138. Lee Branham, PhD affirmed that plaintiff's depression created only mild limitations based on the evidence of record. T138-40.

### 3. ADMINISTRATIVE HEARING

At an administrative hearing held on April 24, 2019, the plaintiff testified more or less consistently with the subjective complaints found in his medical records.

The plaintiff testified that due to pain and limited range of motion in his shoulders he could not reach overhead, and could only lift his arms to shoulder height in front of his body. T48. And since a knee surgery in 2013, the plaintiff has used a cane to walk. T52. He said he can lift up to 10 pounds, but if he lifts more, it will take days to recover. T43, 52. The plaintiff also denied ever helping pick up or carry the children at his wife's daycare business. T58. He testified he can walk about a half-block with his cane and across a room without it. T43.

He said he can only stand for 2-5 minutes before having to take a break because of back pain. T43. The plaintiff also testified to difficulty sleeping because of the pain in his shoulders. T44. Medication allowed him to sleep 5-6 hours, but he eventually woke up due to pain. T44.

The plaintiff further testified that he spent most of the day laying down in a recliner with his arms propped up on pillows. T45. He did some light cleaning, loaded the dishwasher, and went to church. T44, 50. He said he manages his depression using his faith and was not taking medication. T49. He could not do laundry because it is downstairs. T44. If he went to the grocery store, the plaintiff used an electric scooter. T45. He could only bend over if he holds onto something. T45. The plaintiff also testified that doctors have advised him to avoid all exercise except walking in a pool, and to avoid lifting and stooping. T48, 50. And he said he's been told "there's nothing to gain back because of the hypermobility." T48-49.

According to plaintiff, he could not sit all day at a job because nerve damage in his back caused his legs to go numb, and nerve damage in his shoulders caused his arms and hands to go numb. T51-52. He said he would need to work on a level floor without stairs and be able to lay down for part of the day and stand up for small portions. T51, 54. The plaintiff also testified he had very limited use of his hands due to nerve damage, and that picking things up required him to focus on the object and squeeze it tightly. T56-57.

The ALJ inquired specifically about Dr. Mazour's opinion and her strict no lifting recommendation as well as her opinion that the plaintiff could only use his hands less than 5 percent of the time. *See* T60. The plaintiff testified that at the time she wrote the opinion he had a recent shoulder injury, but that he could lift "a little bit now." T60. He also testified that he is at 5 percent of

his fine motor control in his hand from where he was five or ten years prior, and that he thought Mazour's opinion was accurate. T60.

The ALJ also heard testimony from a vocational expert (VE). The ALJ presented the VE with a hypothetical regarding a person with no past relevant work but who: is able to perform sedentary work;[3] is able to stoop, kneel, crouch, crawl and reach overhead only occasionally; should avoid sustained exposure to concentrated temperatures, vibration, and operation of foot controls; could understand, remember, carry out and persist at tasks that are simple, straightforward, and uncomplicated; is able to exercise proper judgment in performing those tasks and is able to respond appropriately to at least routine changes in the workplace and to supervision; and is able to respond and behave appropriately with others when performing tasks that do not require more than incidental and superficial social interaction. T62-63. The VE said such a person would have an occupational base—at the unskilled sedentary level in positions such as document preparer, callout operator and addresser. T63.

The ALJ then asked the VE another hypothetical: if in addition to the limitations in hypothetical one, an individual must use a cane while walking, and do all of the lifting and carrying required by sedentary work through use

---

[3] Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

of a free hand alone, would the person still be able to perform the work previously identified? T63-64. The VE opined that, in his professional experience, such an individual could still perform all three positions. T64.

The plaintiff's counsel then posed another hypothetical to the VE: if the individual with all the limitations set out in hypotheticals one and two posed by the ALJ were also off task 50 percent of the time, would there be jobs available? The VE said there would not be competitive employment for such an individual. T64. And the plaintiff's counsel further posed a hypothetical where the same individual would be absent two or more times per month, and the VE stated such an individual would not find competitive employment. T64. Finally, plaintiff's counsel asked if any jobs permit employees to lay down for a significant part of the day, and the VE said no such jobs exist. T64-65.

## III. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. §§ 416.920(a)(4), 404.1520(a)(4).

### 1. STEP ONE

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006); §§ 416.920(a)(4)(i), 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales,* 465 F.3d at 894.

In this case, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of September 29, 2016. T19.

## 2. STEPS TWO AND THREE

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" §§ 416.920(a)(4)(ii), 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determines, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. §§ 416.920a(a), (d)(1) and (2), 404.1520a(a), (d)(1) and (2). Part one of the special technique requires the ALJ to decide whether the claimant has "medically determinable mental impairment(s)." §§ 416.920a(b)(1), 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment (part two). §§ 416.920a(b)(2), 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." §§ 416.920a(c)(1), 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[u]nderstand, remember, or apply information; interact with others;

concentrate, persist, or maintain pace; and adapt or manage oneself." §§ 416.920a(c)(3), 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. §§ 416.920a(c)(4), 404.1520a(c)(4).

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). §§ 416.920a(d), 404.1520a(d). Generally, if the four functional areas are rated as "none" or "mild," the ALJ will conclude that any impairments are not severe, unless the evidence indicates more than a minimal limitation to a claimant's ability to do basic work activities. §§ 416.920a(d)(1), 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. Some mental disorders, including depression, are also evaluated using "paragraph C criteria"[4] to determine if a claimant's disorder is "serious and persistent." *See* 20 C.F.R. Part 404, Subpart P, Appx. 1, §§ 12.00A.2.c., 12.04C.

---

[4] Paragraph C criteria include:

a medically documented history of the existence of a mental disorder over a period of at least 2 years, and evidence of both:

1. Medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [a claimant's] mental disorder; and

2. Marginal adjustment, that is, [a claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not part of [his] daily life.

§ 12.04C.

At step two, the ALJ found that the plaintiff has the following severe impairments: degenerative changes to his lumbar spine, degenerative joint disease of both shoulders, residuals of right knee surgery, obesity, and depression. T20. The ALJ also considered the plaintiff's high blood pressure and arthritic changes to three of his finger joints, but determined both impairments were non-severe. T20. And the ALJ noted that while the psychological consultative examiner, Dr. Morell, diagnosed the plaintiff with an unspecified anxiety disorder, the plaintiff had denied feeling anxious and not received treatment for anxiety since his alleged onset date. T20-21. So, the ALJ concluded that the evidence did not establish an anxiety disorder. T21.

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled a presumptively disabling listed impairment. T21-23. Concerning the plaintiff's depression, the ALJ found that he had moderate limitations in each of the four functional areas, but that because no marked or extreme limitations existed the "paragraph B criteria" were not satisfied. T22-23. And the "paragraph C criteria" were also not satisfied because the plaintiff was capable of more than marginal adjustment and had no more than a moderate limitation in his ability to adapt. T23. Accordingly, the ALJ proceeded to determining the plaintiff's RFC.

### 3. RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's RFC, which is used at steps four and five. §§ 416.920(a)(4)(iv) & (e), 404.1520(a)(4)(iv) & (e). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all

'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. §§ 416.929(a) to (c)(1), 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. §§ 416.929(b), 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. §§ 416.929(c)(1), 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[5] and "other evidence."[6] §§ 416.929(c)(1) to (3), 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, and evaluates them in relation to the objective medical evidence and other evidence. §§ 416.929(c)(4), 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." §§ 416.929(c)(4) & (d)(4), 404.1529(c)(4) & (d)(4).

The ALJ concluded that the plaintiff had medically determinable severe impairments consistent with his findings at step two: degenerative changes to

---

[5] 20 C.F.R. §§ 416.929(c)(2), 404.1529(c)(2), 416.902(g), (k), & (l), 404.1502(c), (f), & (g).

[6] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* §§ 416.929(a), 404.1529(a); *see also* §§ 416.929(c)(3), 404.1529(c)(3).

his lumbar spine, degenerative joint disease of both shoulders, residuals of right knee surgery, obesity, and depression. T24. But after consideration of the evidence, the ALJ found that although his impairments could reasonably be expected to produce some symptoms, the plaintiff's "statements concerning the intensity, persistence and limiting effects" were not "entirely supported by the medical evidence and other evidence." T25.

In particular, the ALJ concluded that the plaintiff's physical exam history did not support a less-than-sedentary RFC. T25. The ALJ relied on record evidence of normal strength in the plaintiff's legs, successful alleviation of back pain through chiropractic care, a negative straight leg test, and exams where he presented without back pain. T25. Moreover, the ALJ said that despite the plaintiff's use of a cane, his right knee was deemed stable and had normal range of motion. T25. And EMG studies had ruled out various nerve conditions in his right leg. T25-6.

The ALJ further reasoned that objective medical evidence did not support the plaintiff's claim that his shoulders were "constantly dislocated." T26, *see* T51. The ALJ pointed to evidence that the plaintiff's passive range of motion in his shoulders was "significantly more" than his active range of motion, which suggested the plaintiff is capable of using his arms more than he alleged. T26. The ALJ also looked to evidence that the plaintiff's shoulder shrug strength was 5/5, and that he also had good arm and grip strength. T26. So, the ALJ concluded the record did not support the plaintiff's claim that he could not perform the requirements of sedentary exertion. T26.

In regard to the plaintiff's alleged physical restrictions, the ALJ found no record evidence that he had ever been told to avoid physical activities and only exercise in water. T26. Rather, the plaintiff had been advised to participate in physical therapy and lose weight. T26. And when he was active

in physical therapy, objective improvement was noted. The ALJ reasoned that if the plaintiff's symptoms were as frequent and severe as he alleged, he would also continue with the course of treatment that was improving his strength and endurance. T26. And the ALJ noted that the plaintiff's activities of daily living sometimes exceeded his alleged RFC, and while they would result in pain, his activities showed he was capable of sedentary work with the additional restrictions imposed by the ALJ. T26.

Finally, the ALJ determined that the plaintiff's depression did not produce symptoms frequent or severe enough for him to seek treatment, and therefore would not prevent him from work consistent with the ALJ's RFC determination. T26. The plaintiff had demonstrated an appropriate affect, normal speech, and pleasant manner, and had denied feeling depressed. T26.

In regard to the offered opinion evidence, the ALJ found opinions from the plaintiff's treating providers Buschkoetter, Rocker, Mazour and Pierce unpersuasive because they were not supported by the objective medical evidence and were inconsistent with the record as a whole. *See* T27-8. The ALJ found the opinions of State agency psychological consultants Cottam and Branham similarly unpersuasive because they were inconsistent with the record as a whole. T28. And the physical consultative examiner Severson's opinion was "not very persuasive," because it did not address the plaintiff's ability to walk, stand or sit during an eight-hour workday. Moreover, the ALJ found it unsupported by objective evidence. T27.

The ALJ was persuaded by the medical consultant opinions offered by Wheeler and Reed, which he concluded were supported by the evidence and consistent with each other. T27. Finally, the ALJ was persuaded by psychological examiner Morell's opinion because it was supported by her objective examination. T28. Nevertheless, the ALJ "added further limitations"

based on the plaintiff's alleged symptoms of depression "to afford him the most protective [RFC] allowed by the evidence." T28.

Accordingly, the ALJ found the following RFC:

> to perform sedentary work . . . with the following limitations: the claimant is able to stoop, kneel, crouch, crawl, and reach overhead occasionally. He is capable of performing work that does not require sustained exposure to concentrated temperatures, vibration, or the operation of foot controls. He is able to understand, remember, carry out, and persist at tasks that are simple, straightforward, and uncomplicated. The claimant is capable of exercising proper judgment in performing those tasks and responding appropriately to routine changes in the workplace and to supervision. He is able to respond and behave appropriately with others when performing tasks that do not require more than incidental and superficial social interaction. The claimant is capable of performing work that allows him to use a cane while walking and to perform all of the lifting and carrying required by sedentary work using his free hand alone.

## 4. STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. *Gonzales*, 465 F.3d at 894; §§ 416.920(a)(4)(iv) & (f), 404.1520(a)(4)(iv) & (f). If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can

perform. *Gonzales*, 465 F.3d at 894; §§ 416.920(a)(4)(v) & (g), 404.1520(a)(4)(v) & (g).

At step four, the ALJ determined that the plaintiff had no past relevant work. T28. And at step five, the ALJ found that considering his age, education, work experience, and RFC, the plaintiff could perform jobs that exist in significant numbers in the national economy. T29. In so finding, the ALJ relied on testimony of the VE which took into account the additional limitations put on the plaintiff's ability to do sedentary work. T29. So, the ALJ found the plaintiff was not disabled and denied his claims for benefits. T30.

## IV. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner for errors of law and to determine whether the denial is supported by substantial evidence on the record as a whole. *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court considers the entire administrative record—the evidence that detracts from the decision, as well as the evidence that supports it—but the evidence is not reweighed. *See id*. Instead, the Court will disturb the ALJ's decision only if it falls outside the available "zone of choice." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021). And the ALJ's decision is not outside the zone of choice simply because this Court might have reached a different conclusion as the initial finder of fact. *Id*. Rather, if the record contains evidence that a reasonable person might accept as adequate to support the ALJ's conclusion, the Court may not reverse—even if it would reach a different conclusion, or merely because there is also evidence that might support a contrary outcome. *See id*.; *Byes*, 687 F.3d at 915.

The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## V. DISCUSSION

The plaintiff argues the ALJ erred by finding Dr. Mazour's opinion unpersuasive, because the ALJ's rationale was unexplained and unsupported by the record in its entirety. Filing 16-1 at 1. The Commissioner counters that the ALJ did explain why he found Dr. Mazour's opinion unpersuasive—because it was unsupported by and inconsistent with the record as a whole. Filing 19 at 12-13. And the Commissioner emphasizes that the ALJ's decision should not be disturbed "unless any reasonable adjudicator would be compelled to conclude to the contrary." Filing 19 at 9. The Court agrees with the Commissioner.

The evaluation of medical opinions in this case is controlled by 20 C.F.R. §§ 416.920c, 404.1520c, because the plaintiff's claim was filed after March 27, 2017. Under the new regulation, no deference or specific evidentiary weight is given to any medical opinion or prior administrative finding, including those from treating sources. §§ 416.920c(a), 404.1520c(a). Medical opinions and prior administrative medical findings are evaluated using the following factors:

(1)  supportability, specifically by objective medical evidence and explanations;

(2)  consistency with evidence from other medical and non-medical sources;

(3)    relationship with the claimant, including length of treatment relationship, frequency of visits, purpose of the treatment relationship, extent of the relationship, and whether the medical source actually performed an examination or only reviewed records;

(4)    specialization; and

(5)    other factors including: a source's familiarity with other record evidence, the disability program, and whether new evidence received after the opinion may make the opinion more or less persuasive.

§§ 416.920c(c), 404.1520c(c). The most important of the listed factors are supportability and consistency. §§ 416.920c(a), 404.1520c(a).

An ALJ must articulate how persuasive he or she finds all of the medical opinions and prior administrative medical findings. §§ 416.920c(b), 4041520c(b). If one medical source issues more than one opinion or administrative finding, the ALJ need only articulate how he or she considered the source as a whole. §§ 416.920c(b)(1), 404.1520c(b)(1). Because supportability and consistency are the most important factors, those must be discussed by the ALJ, but other factors may or may not be discussed. §§ 416.920c(b)(2), 404.1520c(b)(2). For opinions or prior administrative findings that are found to be equally well-supported and consistent with the record, but that are not exactly the same, the ALJ must articulate how the other factors were considered. §§ 416.920c(b)(3), 404.1520c(b)(3).

According to the plaintiff, the ALJ erred by "failing to provide any legitimate explanation" for discounting Mazour's opinion. Filing 16-1 at 11. And the plaintiff questions whether the ALJ may criticize Mazour's opinion for relying on the plaintiff's subjective reports rather than objective evidence. Filing 16-1 at 11. Finally, the plaintiff says the ALJ did not detail the parts of

the record that were inconsistent with Mazour's opinion. Filing 16-1 at 11-12. The Court finds all of the plaintiff's arguments unpersuasive.

The ALJ found Dr. Mazour's opinion unsupported by and inconsistent with the record as a whole, including "the diagnostic imaging of the [plaintiff's] right knee, shoulders and right lower extremity," and the plaintiff's activities of daily living which involved "more significant use of his hands and lifting up to 10 pounds." T28. Moreover, the ALJ's analysis of Mazour's opinion came after several pages detailing the ALJ's assessment of the medical evidence and why he found the plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms inconsistent with the record as a whole. *See* T24-28.

The ALJ discussed the medical evidence that, in his judgment, contradicted the plaintiff's claims and Mazour's opinion. *See* T25-26. In particular, the ALJ noted the x-ray performed by Dr. May of plaintiff's right knee that was largely normal, *see* T405, and Dr. Severson's observations of normal range of motion in plaintiff's right knee, *see* T423-24. The ALJ also noted Lutkemeier's assessment that the plaintiff's passive range of motion in his shoulders was greater than his active range of motion, *see* T312, and the Sidney Clinic records showing shoulder shrug strength of 5/5, *see* T591. The ALJ reasoned that while the plaintiff had limited range of motion in his shoulders, he maintained good strength in his arms and hands. *See* T309, 423-24. Finally, the ALJ pointed to the evidence that the plaintiff quit two courses of physical therapy despite showing objective improvement. *See* T322-23, 490.

The ALJ also discussed specific activities of daily living that were at odds with the plaintiff's claims of disabling symptoms and Mazour's opinion. *See* T26. The plaintiff had reported doing light yard work, T311, mowing, T309, a busy day of family activities, *see* T307, and lifting and moving things around

in his garage, T336, all after his alleged onset date. And the plaintiff reported holding and caring for children at his wife's daycare, T471, which he later denied at the hearing, T58. Certainly the plaintiff reported increased pain with these activities, but the ALJ reasoned that these activities show he was capable of *sedentary* work within the assigned RFC, which put additional limitations on the plaintiff's physical abilities. T26.

So the Court finds the plaintiff's first and third arguments unpersuasive. The ALJ did provide a legitimate explanation for finding Mazour's opinion unpersuasive and he detailed the parts of the record that conflicted with Mazour's opinion. And any deficits in the ALJ's opinion writing are immaterial so long as the ALJ's decision is supported by substantial evidence on the record as a whole. *See Buckner*, 646 F.3d 559. The ALJ produced an RFC that acknowledged the plaintiff's severe physical and mental impairments and put significant restrictions on the plaintiff's capacity to perform work. And the Court finds the evidence outlined above is substantial evidence on the record as a whole that contradicts both Mazour's opinion and the plaintiff's claims of disability.

As to the plaintiff's second argument—the ALJ did state that Mazour's assessment of the plaintiff's ability to lift, sit, stand, walk, use his hands, and attend work regularly "appear[ed] to be based on the [plaintiff's reports]." The plaintiff argues this shows that the ALJ favored the plaintiff's "modest activities of daily living" over the plaintiff's diagnoses and long history of treatment and formed "his own conclusions about the severity of [the plaintiff's] problems." Filing 16-1 at 12 (quoting *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989)). The Court disagrees.

First, the ALJ undoubtedly acknowledged that the plaintiff had severe impairments of his back, shoulders and right knee which could reasonably

produce some symptoms. T24-25. So, the plaintiff's suggestion that the ALJ thought "[the plaintiff's] impairments did not actually exist," or he was acting to "fool a host of doctors into prescribing him treatment and surgical intervention," are unfair characterizations of the ALJ's decision. *See* Filing 16-1 at 12. Second, as outlined above, the ALJ adequately explained why the combination of the plaintiff's activities of daily living, objective functional testing of plaintiff's joints, x-rays, and the plaintiff's history of improvements with physical therapy all contradicted both the plaintiff's and Mazour's claims of extreme limitation. *See* T25-28.

The plaintiff argues that the ALJ substituted his opinion for those of treating physicians, including Mazour, when "interpret[ing]" diagnostic imaging upon which he relied. Filing 16-1 at 13. That claim is also unsupported by the record. In particular, the ALJ relied on Dr. May's knee x-ray, which showed a well-centered patella and no bone-on-bone arthritis or fractures, and May's conclusion that the plaintiff's knee was stable, *see* T405-06. T25. The ALJ also mentioned Stieb's shoulder x-rays which showed "bilateral degenerative glenohumeral changes," *see* T695, to find that the plaintiff did in fact have a medically determinable impairment in his shoulders. T25. But Stieb did not opine on how much pain the plaintiff would have as a result of the degeneration. *See* T697. Rather, Stieb's single record in 400 pages of medical records noted that while there was degeneration and arthritis in the plaintiff's shoulders, the plaintiff reported improvement with injections and Stieb agreed to inject the plaintiff's shoulder that day. *See* T695-97. So the Court is not persuaded that the ALJ "substituted his own judgment" for Stieb's.

In sum, the Court concludes that the ALJ offered sufficient reasons why he found Mazour's opinion unpersuasive—because it was unsupported by and inconsistent with the record as a whole. Even if this Court could have weighed

the evidence differently, or reached a different conclusion, it cannot say that the ALJ's decision was outside the "zone of choice." *See Klaus*, 988 F.3d at 1024. Accordingly,

IT IS ORDERED:

1. The plaintiff's motion for reversal (filing 16) is denied.

2. The Commissioner's motion to affirm (filing 18) is granted.

3. A separate judgment will be entered.

Dated this 11th day of May, 2021.

BY THE COURT:

John M. Gerrard
Chief United States District Judge